NOTICE
Decision filed 06/18/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250083-U

NO. 5-25-0083

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-1221 |
| | ) | |
| AMAHRION J. LEE, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Sholar and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's conviction and sentence are affirmed where sufficient evidence existed to support defendant's conviction, improper factors were not considered in determining the sentence, the sentence was not excessive in light of the crime and defendant's claims of ineffective assistance of counsel were either deficient or premature.

¶ 2    Defendant, Amahrion J. Lee, appeals the trial court's judgment and sentence. He argues that insufficient evidence supports the trial court's conclusion that he was the shooter. He further argues that his 50-year sentence was excessive, improper factors were considered during sentencing, and his counsel provided ineffective assistance. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On October 12, 2021, defendant was charged, by information, with four counts of murder in violation of sections 9-1(a)(1) and (2) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1),

1

(2) (West 2020)) following the shooting death of Adrian Watson on October 10, 2021. In addition to the statutory sentencing range for first degree murder, the information also included the statutory 25-year firearm sentence enhancement, pursuant to section 5-8-1(a)(1)(D)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(D)(iii) (West 2020)). Defendant was arraigned, counsel was appointed, and a preliminary hearing was requested. The preliminary hearing was held on November 2, 2021, and following the hearing, the court made a finding of probable cause. Defendant entered a plea of not guilty and requested a jury trial.

¶ 5 On September 6, 2022, defendant obtained private counsel to represent him, and the court's appointment of a public defender was vacated. A Rule 402(d) conference (see Ill. S. Ct. R. 402(d) (eff. July 1, 2012)) was held on June 17, 2024, but no agreement was reached. On October 7, 2024, defendant advised the court that he wished to waive his right to a jury trial. Following admonitions and review of the written executed waiver, the trial court granted the request.

¶ 6 Defendant's bench trial began on November 6, 2024. The court first addressed the prior settlement negotiations. The parties confirmed that a "flat 25-year" offer was made. Defendant confirmed his rejection of that offer and when he was advised that it was "still on the table," again rejected the offer.

¶ 7 The following evidence was presented at the trial. A shooting occurred at Asia Dixon's apartment in the Rainbow View complex in Urbana, Illinois, around 7:00 a.m. on October 10, 2021. Asia testified that she and defendant were in a relationship that began in 2018 and ended in September 2021. On October 9, 2021, Asia, along with her friends, Dan'y and Lupe, went to a bar for Dan'y's birthday. The group later returned to Asia's apartment with Adrian (who was called "A.J."), Rel, Demariae ("Mar-Mar"), Von, and Pooh. Asia did not know the full legal names of any of the men. They left the club around 2:00 a.m. and returned to her apartment around 3:00 a.m.

¶ 8    Video, obtained from a Ring doorbell on a neighboring apartment, revealed the arrival and departure of individuals at Asia's apartment early that morning. Three people walked toward Asia's apartment at 4:36 a.m. At 4:46 a.m., two people walked toward the apartment parking lot. The same two people walked toward Asia's apartment around 5:53 a.m. At 7:05 a.m., a man wearing black pants with white marks on them, red underwear, white shoes, and a black hooded sweatshirt walked toward Asia's apartment. At 7:07 a.m., Asia and Lupe walked toward the parking lot and Asia is heard stating, "You're weird" and that she intended to "call the police" as they walked. As the girls were walking, eight gunshots were heard, and shortly thereafter, the man who initially appeared in the 7:05 a.m. video moved quickly toward the parking lot. Around 7:11 a.m., two men walked toward the parking lot with one stopping to knock on the door with the Ring doorbell. At 7:12 a.m. the two men returned with Lupe. At 7:13 a.m., three men quickly headed to the parking lot, and Asia returned and walked toward her apartment. At 7:14 a.m., a fourth man walked toward the parking lot, looked around and then headed back toward Asia's apartment. The police arrived at 7:15 a.m.

¶ 9    Asia testified that eventually everyone fell asleep in her apartment. Adrian was sleeping in the first bedroom on the left and everyone else was in Asia's room. Around 7:00 a.m., Asia heard a knock on her window and thought it was Dan'y because Dan'y had left the apartment after they returned from the club. Asia woke up Lupe to tell her about the knock on the window. Asia then heard a knock at the front door. She and Lupe went to the door. When they opened the door, no one was there. Asia began closing the door and an individual jammed his foot between the door and the door frame so the door would not close and eventually pushed his way into Asia's apartment. At trial, Asia identified defendant as the individual who pushed into her apartment, stating that she did not see him but recognized his voice because she had known him for years.

3

¶ 10    Asia stated that defendant wanted to know what was going on in the apartment. Asia told him there were people there and he needed to leave. Defendant continued to push into the apartment. Asia and Lupe left the building. After they left, Asia heard several gunshots and saw defendant running out of her apartment. She then saw defendant enter a gold car that she recognized as belonging to defendant's mother. Asia and Lupe went upstairs to a neighbor's apartment, and Asia called her mother and the police. Asia spoke with police who advised her of, and eventually showed her, the Ring doorbell video that was obtained from Asia's neighbor. Asia identified the people shown in the videos at the various times. When she reviewed the 7:05 a.m. video at trial, Asia identified the individual arriving at 7:05 a.m. and leaving at 7:07 a.m. as defendant. Asia advised the police of defendant's identity and address.

¶ 11    At trial, Asia was questioned about her conversations with the officers. She did not recall saying anything to the officer about seeing defendant with a weapon. However, she agreed at trial that she saw the gun and explained that was why she and Lupe left the apartment and why she said defendant was weird and that she was going to call the police. Thereafter, she heard the gunshots. She stated that, to her knowledge, there were no guns in the apartment before defendant arrived. She also stated that none of the people in the apartment shot Adrian; defendant did the shooting.

¶ 12    On cross-examination, Asia stated that she and defendant broke up in September 2021 because he hit her in the face. She could not recall what she told the police officer who arrived and disputed telling the officer that defendant punched her face. She stated that she told the officer that defendant slapped her face. As to the October 10, 2021, event, Asia agreed telling the officers that when defendant put his foot in the doorway, defendant told her that if there was a guy in the apartment, he was going to kill him. She disputed any fights in the apartment around midnight, stating they were at the bar at that time and opined that the source of the argument may have come

4

from a different residence. As to the neighbor's claim of an argument around 5:00 a.m., Asia stated that she was asleep, but that Lupe later told her that she and Adrian left the apartment around 5:00 a.m. The only argument Asia recalled was one with Mar-Mar after the shooting when he accused her of "setting them up." She explained that Mar-Mar made the statement because neither she nor Lupe were in the apartment after the shooting occurred. Asia confirmed that she saw defendant in the car when he drove off because he "hung out the window." She told the officers that defendant was wearing a black sweater with a hood, which she explained was the same thing as a jacket.

¶ 13    On redirect, Asia explained that prior to the slapping incident in September 2021 defendant accused her of being at a party with Mar-Mar. She confirmed that Mar-Mar was at her apartment on the morning of the shooting. She also clarified that in addition to knowing defendant's height, voice, shoes, and clothing, she knew it was him by his hand tattoo which she saw when he was at the door. She recognized his car because she rode in it multiple times. She could not remember the exact quote from defendant at the door but said it was similar to, "Whoever in here is about to die." Asia further explained that her classification of the black sweater with a hood was similar to a "hoodie" or a sweatshirt.

¶ 14    Video, from three different angles, taken from the Tuscany Cove Apartments in Champaign, Illinois, where defendant and his mother lived, was shown. The video revealed a man leaving the 2404 Highview apartment building around 6:45 a.m. and walking to the parking lot. The same individual is seen returning to the parking lot, parking in the same spot, at 7:19 a.m. The individual was wearing white shoes, black pants with white paint marks. Upon his return, he was seen carrying a black item in his hand. Additional video later showed the same male wearing black pants with white marks walking down a sidewalk. Shortly thereafter, footage revealed a single line

of people that initially showed defendant's mother, defendant, and then the mother's roommate walking past the pool and away from the apartment complex.

¶ 15 Guadalupe "Lupe" Rios Trujillo testified that she was previously best friends with Asia and had known her since elementary school. She knew defendant through Asia and also previously worked with him at Walmart. Lupe stated that she was no longer friends with Asia. On October 9, 2021, she met Asia at Asia's apartment to drink. Other people were partying there, and the group went to a bar. She and Asia later returned to Asia's apartment with four men called Dee, Pooh, Mar-Mar, and Adrian. She knew the men but only vaguely. At some point, Lupe and Adrian went to a gas station to get drinks and snacks and returned around 5:53 a.m. The group ate snacks and fell asleep. Lupe was awoken by Asia after Asia heard a knock on the window. Lupe believed it was Dan'y returning to Asia's apartment. Lupe and Asia then heard a knock at the door, and they went to open the door. No one was there, but when they tried to close the door, somebody put their foot in the door. Lupe could hear Asia arguing with the person pushing in the door. Lupe testified that she never saw the person because she was behind the door but heard a male voice ask who was in the apartment while Asia tried to keep the man out. Asia was unsuccessful. The man came into the apartment and Lupe and Asia walked out. Shortly thereafter, they heard gunshots. Lupe assumed the person who entered the apartment was defendant due to the on/off nature of his and Asia's relationship. She did not see the man run out of the apartment after the shooting because she was upstairs with Asia at a neighbor's house.

¶ 16 Lupe testified that she remembered having conversations with police officers after the incident. She agreed that she told the officer that the person who "busted into the apartment" was defendant and that she knew it was defendant because she had been friends with Asia for a long time. She could not recall if she told the officer that she saw defendant's face, recognized him from

6

his face, or whether defendant was holding a gun when he entered the apartment. She said he was wearing a black "hoodie" with the hood up and did not see his hair. Lupe stated she was no longer 100% certain of who entered the apartment.

¶ 17 A stipulation was entered regarding Adrian's cause of death. The stipulation stated that Adrian had two gunshot wounds which were the cause of his death.

¶ 18 Urbana Police Officer Oliver Marquez, testified that he was dispatched to Asia's apartment on October 10, 2021. He was later dispatched to Champaign, Illinois, where defendant and his mother were stopped by the Champaign police. Officer Marquez drove defendant to the police station and seized defendant's clothing. He identified the clothing as including red underwear and black jeans with white marks.

¶ 19 Officer Osric Hays, previously with the Urbana Police Department, testified that he canvassed the crime scene and located a motion-activated Ring camera from which he recovered numerous audio and video recordings. Officer Hays identified the video of Asia and Lupe leaving the apartment shortly before the gunshots were heard with a man running away at the end. Officer Hays was wearing a body camera and identified the footage. The footage included Officer Hays showing the Ring video to Asia and Asia stating that defendant was the individual running away after the gunshots. Officer Hays advised the police department of Asia's identification and was later dispatched to Tuscany Cove Apartments, where he secured the scene at defendant's apartment until a search warrant could be obtained. On cross-examination, Officer Hays described the clothes seen on the video as jeans with white lines and a black shirt. He agreed that he saw no design was shown on the front of the shirt in the video.

¶ 20 A stipulation regarding Champaign Police Officer Jherion Broadnax's testimony was presented. The stipulation stated that Officer Broadnax would testify that he was the first law

enforcement officer to see defendant and the gold vehicle after the shooting. Officer Broadnax was present when defendant's vehicle was stopped, contacted the Urbana police, and maintained custody of the scene until Urbana officers arrived.

¶ 21 Urbana Police Officer Andrew Hewkin testified that he was involved with searching the gold vehicle after the vehicle was impounded. He seized two cell phones from the vehicle. The phone from the passenger seat, where defendant was located when the car was stopped, was provided to a specialist trained in analyzing cell phones at the police department. The officer did not recall seeing any clothing or blood in the car. Nor did he smell any gunpowder.

¶ 22 Additional stipulations that were presented to the court involved firearm toolmarks, DNA testing and gunshot residue (GSR). The parties stipulated that the firearm testing revealed that all the casings found were fired from the same firearm. They also stipulated that DNA testing found only defendant's DNA on the white Crocs taken during the search executed at the Tuscany Cove apartment. Finally, the parties agreed that the GSR testing concluded that it could "neither confirm nor disprove [defendant] had either recently fired or been in the presence of a firearm discharge."

¶ 23 Urbana Police Detective Kenneth Sprague testified that he was dispatched to the Tuscany Cove apartment and photographed the apartment where defendant was residing. He also obtained the video surveillance footage from that apartment complex. He took photographs outside the building that included photographs of a black jacket found hanging in a tree near defendant's residence. The article of clothing was collected for evidence. He did not know if the jacket was tested for DNA because he was not the lead detective on the case. Detective Sprague also obtained search warrants for defendant's residence, Asia's residence, and the impounded vehicle, which was owned by defendant's mother and contained a piece of mail addressed to defendant in the

8

glove compartment. He did not recall any clothing being in the vehicle. He looked for a gun but did not find one.

¶ 24    Alexandria Grady, previously of the Urbana Police Department, testified that she was dispatched to Asia's apartment following the shooting. She spoke to Asia and Lupe outside Asia's apartment. Video footage from Officer Grady's body camera was shown in which Asia told the officer that she saw defendant with a gun when he pushed into her apartment. She stated it was a brown clip on a black gun. Additional video revealed Asia telling Officer Grady that defendant said he was going to kill whoever was in the apartment and then she heard seven or eight gunshots. The body camera video also showed Asia telling Officer Grady that Lupe also saw defendant and that defendant was driving his mother's car.

¶ 25    Illinois State Police Trooper Robert Telford testified that he worked as a crime scene investigator at the scene of Adrian's murder. He took numerous photographs of the eight cartridge casings ejected from the gun after it was fired, as well as the bullet holes in an air mattress and the walls. He agreed that based on the casings found, GSR would be created. He stated that typically the residue was found on the back of the hand. He performed a GSR test and collected DNA from defendant in the interview room at the police station. He stated that GSR was very time sensitive because it could be wiped or washed away. He further stated that defendant's GSR test was given after the police interview approximately three and a half hours after the murder. Trooper Telford did not know the results of the GSR test.

¶ 26    Urbana Police Officer Adam Marcotte testified that he was the lead detective in the case. He interviewed Asia and Lupe after driving them to the station to obtain their statements. Asia told him that the individual who pushed his way into her apartment was defendant and he had a gun at the time. Lupe also told the officer that she identified defendant by his voice and that he was

9

holding a black gun. Following the interviews with Asia and Lupe, Officer Marcotte interviewed defendant with Officer McCartney. The interview was recorded with sound and picture. He confirmed defendant was read his *Miranda* rights prior to the interview and then waived them.

¶ 27 Officer Marcotte testified that he was familiar with the videos taken at the Tuscany Cove apartments that showed defendant leaving the apartment complex around 6:45 a.m. and then returning around 7:20 a.m. He stated defendant was wearing the same clothing he had on at the scene of the shooting. After the shooting, defendant returned and entered the apartment building where he lived. Defendant was seen on video with a different shirt and shoes. A search warrant for defendant's residence was obtained, and a pair of white Crocs were seized. He stated the shoes were found in one of the bedrooms and were similar to the ones seen on defendant when he was at Asia's apartment before and after the shooting. Officer Marcotte also testified that still frames from the Ring video revealed defendant holding something black in his right hand in a manner the officer stated was consistent with holding a gun. He stated that two cell phones were obtained from the search of the vehicle. One belonged to defendant's mother and the other belonged to defendant.

¶ 28 Officer Marcotte admitted that he did not request forensic or fingerprint testing on the black jacket found in the tree. He believed he reviewed a police report involving Asia and defendant from a month prior to the shooting but did not recall what was in the report and did not ask Asia or Lupe about the September report when they discussed the events of October 10, 2021. Officer Marcotte attempted to contact the remaining men in the apartment but did not have their full names and only spoke to Mar-Mar on the telephone. Mar-Mar would not provide his real name and refused to identify the other men. The officer utilized additional methods to try to obtain the names of the men, but all proved fruitless. The officer did not know the brand of defendant's jeans, whether they were distributed, or whether the size eight Crocs were sized for male or female shoe

10

sizes. He confirmed a conversation with Asia's neighbor who indicated there were two arguments the previous night. One around midnight and the other at 5:00 a.m. He did not know if defendant still had a key for Asia's apartment and stated that no forensic testing was done on the window where the initial knock was heard. He agreed that aside from the blurry picture of a possible firearm in defendant's hand when he left the apartment, there was no other evidence that defendant had a gun when he was at Asia's apartment. He further agreed that the murder weapon was never recovered, that DNA was recovered on the Crocs, and that Mar-Mar initially believed that Asia and Lupe were setting him up for the murder.

¶ 29     Officer Darrin McCartney, a detective with the Urbana Police Department, testified that he was present for defendant's interview and that defendant was read, and waived, his *Miranda* rights. At the beginning of the tape, defendant is alone in the room. He is seen rubbing the backs of his hands on his clothes after taking a drink of water. In the police interview, defendant told the officers that the cracked-screen phone found in the vehicle was his. He disputed being at Asia's apartment and stated it must have been someone with a similar build. He further stated that other people had cars similar to his mother's car. He stated that he did not do any shooting because he did not have a gun. Defendant told the officers that there was no gun in the car when he was stopped with his mother. When defendant was told that there was Ring doorbell video, he stated that he knew about the cameras and if he had gone over there, he would have worn a mask but continued to state that he did not go to Asia's apartment. Toward the end of the interview, defendant again stated that he did not have a gun and was not at Asia's apartment that morning.

¶ 30     A stipulation regarding the cell phone data was provided to the court. The stipulation revealed that two short videos depicting the defendant holding a 9 mm handgun on September 17, 2021, were found on defendant's cell phone.

11

¶ 31    Doug Pipkins, an officer with the Urbana Police Department, testified that he held expertise as to digital forensics for data extraction and cell phone analysis. Officer Pipkins identified the defendant's phone as well as the videos from September 17, 2021, found on the cell phone. Officer Pipkins also extracted geolocation data from the phone for the period from 6:00 a.m. to 8:00 a.m. on October 10, 2021. The geolocation data revealed that defendant's cell phone traveled from defendant's residence at the Tuscany Cove apartments in Champaign, Illinois, across to Urbana, Illinois where Asia's apartment was located from 6:48 a.m. to 7:05 a.m. Thereafter, the data indicated the phone moved from Asia's apartment around 7:09 a.m. and returned to the starting location in Champaign, Illinois at 7:18 a.m. The officer stated that the certainty of the location was dependent on proximity of cell towers to the location of the phone, but the locations listed were within 60 meters.

¶ 32    Following Officer Pipkins's testimony, the State rested. Defense counsel moved for a directed verdict. Counsel argued that the case depended entirely upon the credibility of Asia and Lupe and neither were credible enough to be believed beyond a reasonable doubt. The court denied the motion after considering the evidence in a light most favorable to the State.

¶ 33    After confirming that defendant would not testify, defense counsel requested the court take judicial notice of the weather in Champaign, Illinois on October 10, 2021. The temperature was 66 degrees at 7 a.m. and rose to 70 degrees by 9 a.m.

¶ 34    Defense counsel called Kimberlee Gruenstein, the forensic scientist working for the Illinois State Police who evaluated defendant's GSR testing. Gruenstein explained how gunshot residue occurred and stated that the results of the testing revealed that defendant may not have discharged a firearm with either hand. Alternatively, she stated that the results indicated that if defendant discharged the firearm, then the particles were not deposited, were removed by activity, or were

not detected by the procedure. Gruenstein found two particles in the testing but not the tri-component particles with lead, barium, and antimony. Gruenstein agreed that the GSR sample neither proved, nor disproved, that defendant fired a gun.

¶ 35    Officer Josh Jeffers, an officer with the Urbana Police Department, testified about the September 12, 2021, police report he authored following his interview with Asia. He stated that Asia told him she was in a verbal altercation with defendant and defendant punched her twice in the face. He stated that Asia said punched, not slapped. The officer did not see any marks on Asia's face but noted there was a mark on the inside of her lip. He did not think the injury was consistent with being punched in the face. However, he agreed that if the punch was more of a graze, or was made without a hard swing, it would not cause much of an injury. He agreed that bruises develop later in time and may not be visible immediately after the contact. He stated that the injury to the inside of Asia's lip was consistent with a recent hit.

¶ 36    Defense counsel entered the final stipulation to statements provided by Asia's neighbor, Destiny Lewis. Destiny reported hearing an argument coming from Asia's apartment between 11 p.m. and midnight on October 9, 2021, and around 5 a.m. on October 10, 2021. The voices included both a male and a female.

¶ 37    Following the presentation of the stipulation, the defense rested. Defense counsel renewed his motion for a directed verdict, which was again denied. Closing arguments were presented and the matter was taken under advisement. The following morning, the court issued its ruling. It found both Asia and Lupe credible, noting there was not much time for them to fabricate a story. The court further noted, that despite the September breakup, Asia and defendant continued to communicate and were considering reconciliation. The court analyzed Asia's comment of "You're weird" and found it would be an odd statement to make toward a stranger. The court stated that

13

the man seen leaving after the shots were fired was running away, which it found "indicative of consciousness of guilt." The court also addressed the blurry photograph and said it was not definitive but "it certainly has the clear shape of a firearm in his hand as he's running out."

¶ 38　The court stated the real issue was the identity of the man in the black jacket, black pants, white shoes, and red underwear. The court considered Lupe's testimony, which used the word "assumed." It further considered Asia's testimony that "unequivocally said it was the defendant," noting the tattoo on his hand, his height, his weight, and his speech and the length of their relationship. The court noted that Asia further testified at trial that she saw defendant with a gun. The court agreed there were "some inconsistencies" between the testimonies provided after the incident and at trial, but noted how quickly the officers arrived, the similarity of Asia and Lupe's version of events, their emotions immediately following the shooting, and that three years passed between the shooting and the trial.

¶ 39　The court said there was no question that defendant entered into a gold car and defendant was arrested wearing the black pants and red underwear that matched the description of the person seen on video. The court further noted that defendant's DNA was found on the white Crocs indicating that he had worn them before. The court found the GPS data even more compelling than the black pants, red underwear, and white shoes. It noted that defendant told the investigators that he was never at Asia's apartment that morning, but the GPS data showed otherwise, and the GPS data was corroborated by the video surveillance at defendant's residence. The court found that defendant "lied to the police" about his location and the fact that he did not have a gun, which was contradicted by the September video found on his phone.

¶ 40　The court found the State proved "defendant guilty beyond a reasonable doubt of first degree murder in all four counts." The court further found that the State proved beyond a

14

reasonable doubt that defendant "personally discharged the firearm that caused the death of the victim." The court ordered the preparation of a presentence investigation report (PSI).

¶ 41    On December 3, 2024, defense counsel filed a motion for a new trial. Therein, counsel argued that neither Asia nor Lupe were credible, claiming their initial stories did not match the video recordings and their testimony at trial was changed to match the videos. The motion claimed that several different versions of events were presented by both witnesses who had "powerful motivating factors driving them strongly emotionally in opposition to [defendant]." The motion claimed the witnesses committed "multiple acts of obstruction of justice" because they told witnesses to leave before the police arrived, "changed their stories multiple times", and "pretended to not know the actual names" of the other witnesses at the apartment despite spending the night with them. In addition to addressing the lack of credibility, the motion further contended that defendant's face was not seen in any video, no weapon was found, a jacket was found but there was no evidence linking the jacket to the crime or to defendant, defendant was not seen on video with a firearm, GSR testing was negative despite defendant having dirt on his hands, motions *in limine* "were denied in significant part," and evidence was improperly admitted.

¶ 42    The PSI was filed on December 17, 2024. The PSI revealed one prior juvenile misdemeanor for criminal damage to property in 2017 and no prior adult convictions. Defendant graduated from high school after being referred to the Regional Education Alternative for Developing Youth (READY) school after 10th grade due to behavioral issues stemming from anger management and fighting. His prior employment included Circle K, Walmart, and Burger King. He described his mental health as "fair," stating he never obtained evaluations but that he struggled with depression and anxiety his whole life, was emotionally closed off, and craved attention. He claimed two suicide attempts in 2020 when he stepped out in front of a car and again

15

in 2021 when he took pills. He had never been physically, emotionally, or sexually abused. Defendant had four siblings. His father was in and out of prison and was now deceased. He had a close relationship with his mother although they tended to "butt heads." He had a history of drinking and drug use with the latter including cannabis, Percocet, and Ecstasy, all of which began when he was 15 years old.

¶ 43    Defendant's motion for a new trial was heard on December 20, 2024, prior to the sentencing hearing. No argument was presented by defense counsel, and the State only disputed the language used regarding the GSR testimony. The court noted that the issues raised were addressed when it issued its initial ruling and denied the motion for a new trial.

¶ 44    As to the sentencing hearing, no changes or additions were necessary for the PSI. The State asked the court to consider the photographs of defendant with the gun in September 2021 in aggravation. Adrian's mother read a victim impact statement. As evidence in mitigation, a photograph of defendant's mother, Letika Graham, was submitted in which Letika held a gun. Letika testified that the gun in the photograph was a toy gun that held pellets and was not a real gun. She stated that neither a gun nor bullets were found in her house. On cross examination, Letika could not state with certainty that the gun in her photograph was the same gun seen in defendant's video. On redirect, Letika said she believed it was the same toy gun shown in the pictures at defendant's trial. The State recommended 50 years' incarceration. Defense counsel requested the minimum sentence of 45 years' incarceration. Defendant provided a statement in allocution, stating that he did not commit the crime, but he understood both families' pain.

¶ 45    Thereafter, the court issued its ruling, and stated the following:

"The Court is considering statutory and nonstatutory factors in aggravation and mitigation whether specifically mentioned or not. I'm considering the history

16

and character of the Defendant with the objective of restoring him to useful citizenship. I'm also concerned about the seriousness of the offense.

* * *

There is mitigation in this case. Mr. Lee was 18 years old at the time of the offense. He's now 22. He has no children to support. He was able to get a high school diploma. Although, he had some issues with behavioral things. He was expelled for fighting and the like and put in anger management classes. He has been able to work periodically before he was incarcerated.

I would note that there's also mental health issues. I did read in the report that he's in good physical health, but he struggles with depression and anxiety and the new phrase in the world is unaliving yourself. They indicate that he attempted to take his own life twice in '20 and '21 so clearly has mental health issues.

He had been involved in the criminal justice system. He had been involved in the school system. A lot of opportunities to get help for free, but I agree with [defense counsel] that if you have to go and pay or you have insurance to get mental health treatment it's sometimes hard. I get that, but there was some opportunity for him to get it while he was in the system, so to speak.

He has used some alcohol. He was using cannabis daily from 18. When he was 18[,] he was smoking the equivalent of—and I—I had to double-check, but it said 18 blunts a day which is significant. There was really never any evaluations or treatment which having a substance abuse problem can cut both way for mitigation and aggravation, but when you have a problem and you're not getting help it oftentimes falls more on the aggravation side than the mitigation side.

The Supreme Court has said many, many times that perhaps one of the most compelling factors, if not the most compelling factor, is the nature and circumstances of the offense. ***.

If a firearm is used and it's proven beyond a reasonable doubt, which I found, our General Assembly in its infinite wisdom—whether I agree with it or not I'm required to follow the law and the minimum is 45 years, but there has to be sort of a spectrum of conduct for murder because there's so many different facts and circumstances.

In this particular case many of the facts and circumstances are more aggravating than mitigating, and, in fact, there are several aggravating factors such as deterrence to deter him from committing crimes and others who might be in the same situation. He has that one juvenile case for criminal damage to property, but he completed everything so really that's more mitigating, but the facts of the case are such that even though he's a young man and even though he doesn't really have a criminal record he has anger control issues which he's had since he was a kid. He obviously had anger or jealousy issues at this time of the shooting.

Whether he usually played with toy guns with his siblings or not[,] it's clear on this particular day he had an actual firearm. He got the firearm. He drove to the location. He went into the apartment, went straight to the front bedroom and shot eight times, shooting the victim twice. He then ran away, got rid of the gun, got rid of one of the jackets he was wearing. There were other people around who potentially could have been hurt by this.

18

It was clearly planned. It was motivated out of anger or jealousy. He shot multiple times. This was not just shoot somebody in the leg or even shooting, you know, in the heart one time. I mean, this was multiple shots. I find the facts and circumstances of the case more aggravating than mitigating.

Now, there are a couple statutes I want to talk about very briefly. One is in the sentencing code 4.5-115. I believe if someone's under age 21 potentially they can be paroled after 20 years which is going to apply. There's no guarantee whether I give him 45 or 50 or a hundred years, you know, or *** life or whatever within the range that he's going to get out in 20, but the statute does permit him to apply for release after 20 years.

The other one is Section 5-4.5-105 which doesn't really apply here, but I do want to discuss it because this is the statute that says if you commit a crime, including murder, when you're under 18 the Court should consider other factors. Now, he was not 17, but he was barely 18. And some of these factors I think are important, but I'm supposed to consider them in mitigation but when I look at them they're really actually more in aggravation. Although he wasn't a member of a gang I don't think he was influenced by other people. He was the only person involved in the shooting. I would also note that there's nothing that shows that this was impetuous. It was planned. I would also note that there was no abuse within his family. He had good relations generally with his family such as his siblings and his mother. He had the ability to understand that the consequences—what the consequences of his actions were, so I'm not really gonna give a lot of weight in aggravation to that because the statute technically doesn't apply. But—but it's nice

19

to look at those factors as well because I think they are important to somebody who is just barely 18, so I don't find those factors in particular are mitigating even if I were to consider them.

* * *

There is mitigation here. He's young. He has no record. He has mental health issues. All the other factors I've considered.

There's the aggravation that he was angry. He's used drugs and alcohol. He's enjoyed being around the gun culture. Whether it's a real gun or fake guns he likes the gun culture. The facts and circumstances of the case such as its planning and its deliberate nature, the fact that he shot it multiple times.

* * *

Imprisonment is required. It's also necessary to protect the public. I don't think the minimum under the circumstances are appropriate because of the nature and circumstances of the—of the case as I've described, but I don't think there is significant mitigation, so I don't think a lot over the minimum is really required."

The court found the State's recommendation appropriate and sentenced defendant to 50 years' imprisonment to be served at 100%.

¶ 46 Following the sentence, defense counsel orally requested a motion for reduction of sentence to be filed *instanter*. The court granted defense counsel's request. The motion requested the court reduce defendant's "sentence to the 45 year box without parole minimum" and claimed the minimum sentence was "nonetheless extreme and inappropriate." No argument was presented. The court found "the sentence was appropriate" and denied the motion. Defense counsel orally requested appeal and appointment of counsel on appeal on behalf of defendant.

20

¶ 47                                    II. ANALYSIS

¶ 48     On appeal, defendant argues that insufficient evidence was presented to prove his guilt for first degree murder, and trial counsel provided ineffective assistance by failing to seek suppression of defendant's statements during the police interview and during trial counsel's cross-examination of a witness. He further argues that his 50-year sentence was excessive and was based on improper factors, and that his counsel was ineffective for failing to challenge the 25-year firearm enhancement under the proportionate penalties clause. The State disagrees with each argument.

¶ 49                          A. Sufficiency of the evidence.

¶ 50     Defendant contends that insufficient evidence of his guilt for first degree murder was presented because the State failed to prove, beyond a reasonable doubt, the identity of the shooter. He claims that four other people were in the apartment when the shots were fired, and no one testified that one of those people did not fire the fatal shots.

¶ 51     Sufficiency of evidence claims require this court to consider whether, when viewing all the evidence adduced at trial in a light most favorable to the State, "any rational trier of fact could have found [proof of] the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) (Internal quotation marks omitted.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Such review requires this court to accept reasonable inferences by the trial court (see *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and leaves credibility rulings of the witnesses to the trial court. *Ross*, 229 Ill. 2d at 272. Only where a conviction is "so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt" will the conviction be reversed. *Id.* "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 279. "Testimony may be found

21

insufficient under the *Jackson* [*v. Virginia*, 443 U.S. 307, 319 (1979)] standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280 (citing *People v. Smith*, 185 Ill. 2d 532, 545 (1999); *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991)). While the fact finder's decision to accept testimony is entitled to great deference, it is not conclusive and does not bind the reviewing court. *Id.* (citing *Smith*, 185 Ill. 2d at 542).

¶ 52    Here, the trial court found both Asia and Lupe were credible and defendant was not credible. Our review of the evidence fails to establish a conclusion that no reasonable person would accept Asia and Lupe's testimony as credible. While defendant relies on inconsistent testimony between Asia and Lupe's initial police interviews and testimony at trial, as the court noted, over three years passed between the murder and the trial, both women were reluctant witnesses, and there was no evidence that either witness reviewed their previous statements prior to the trial. Despite the lack of alacrity by both witnesses to prepare for trial, Asia's testimony continued to state that defendant pushed into her apartment on the morning of the shooting, he had a gun with him at that time, and there were no firearms in the apartment prior to defendant's unexpected appearance at her door. Testimony of a single witness, if positive and credible, is sufficient to uphold a conviction. *Smith*, 185 Ill. 2d at 541.

¶ 53    Here, Asia's testimony at trial, while admittedly inconsistent on a few points with the statements provided to police immediately following the shooting, continued to state that defendant was the shooter. Her identification of defendant as the shooter was based on her knowledge of his voice and body. Further, Asia's testimony was corroborated by the videos from the Ring doorbell, the videos from the apartment complex where defendant lived, and the GPS data from his cell phone, which all placed him at the apartment. As such, defendant's claim that

22

the evidence "hinged on the testimony of two women" seems implausible given the evidence that showed defendant was at the apartment at the time of the shooting and ran out of the apartment immediately after the eight shots were fired with what appeared to be a firearm in his right hand. While there were other men who left the apartment after the shooting, none were shown on video holding a weapon, and one of the men actually knocked on the neighbor's door where the Ring video was located. Finally, contrary to defendant's claim, Asia did testify that none of the men in the apartment shot Adrian.

¶ 54   Defendant also argues that the murder weapon was not found and his GSR testing was negative. There is no dispute that the murder weapon was not found. However, Asia placed defendant with a gun and no one other than defendant appears to be holding a firearm in their hands when they are seen arriving and leaving the apartment.

¶ 55   Further, defendant's claim that the GSR testing was negative is a misrepresentation of the evidence. The stipulated conclusion of the GSR testing evidence stated that the State of Illinois forensic expert concluded that "the analysis can neither confirm nor disprove [defendant] had either recently fired or been in the presence of a firearm discharge." The expert's testimony at trial also revealed that defendant's testing revealed two of the three required chemicals for a positive GSR test result. Additional testimony clarified that time itself could destroy residue just as easily as washing or wiping the hands. Here, the video evidence revealed defendant returned to his own apartment after Adrian was shot, which would have allowed defendant sufficient time to wash his hands, before he was arrested. Additionally, police officers testified that GSR is typically found on the back of a shooter's hand and the GSR can be removed over time, or with washing or wiping of the hands. Here, additional video evidence showed defendant being placed in the police interview room with his hands cuffed behind him. An officer then removes defendant's handcuffs

23

and places them on defendant so that defendant's handcuffs are now in front of his body. Defendant is provided a chair and a bottle of water before the officers leave the room. Thereafter, defendant looks directly at the video camera. He then takes a drink of water, bends over at the waist and rubs the backs of both hands repeatedly on the front of his sweatshirt and jeans for 20 seconds, all of which occurred less than three minutes after defendant was placed in the police interview room. As noted above, a sufficiency of the evidence claim requires this court to view the evidence in the light most favorable to the prosecution. Given the evidence submitted, we hold that sufficient evidence was submitted to find that each element of first degree murder was established, including the identity of the shooter.

¶ 56                    B. Failure to suppress police interview statements.

¶ 57    Defendant next contends that his trial counsel provided ineffective assistance by failing to suppress defendant's police interview statements. In support, defendant contends that he did not knowingly and willingly waive his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). He further claims that even if he knowingly and willingly waived those rights, trial counsel was ineffective for failing to suppress the statements made after defendant invoked his right to remain silent. *Miranda* warnings are necessary after "an individual is taken into custody or otherwise deprived of his freedom *** and is subjected to questioning." *Id.* at 478-79.

¶ 58    Typically, whether to file a motion to suppress evidence is a decision made by trial counsel that is generally entitled to great deference because the decision is a matter of trial strategy. *People v. Gayden*, 2020 IL 123505, ¶ 28. We review claims of ineffective assistance of counsel under the two-pronged *Strickland* (see *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) standard. *People v. Torres*, 2024 IL 129289, ¶ 26. The test requires a defendant to show that (1) counsel's performance "fell below an objective standard of reasonableness and (2) that a reasonable

24

probability exists that, but for counsel's errors, the result of the proceeding would have been different." *Id.* ¶ 27 (citing *People v. Peterson*, 2017 IL 120331, ¶ 79). More specific to the allegations here, a contention of ineffective assistance of counsel for the failure to file a motion to suppress requires the defendant to show the unargued motion "was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Gayden*, 2020 IL 123505, ¶ 28.

¶ 59 Defendant first claims that he did not knowingly or willingly waive his *Miranda* rights. In support, defendant claims he was too young to understand the significance of the rights. To determine whether a defendant's waiver is knowing and intelligent, courts consider factors including the defendant's age, education, intelligence, experience with the criminal justice system, length of detention and interrogations, whether he was advised of his constitutional rights, and whether he was mistreated or abused. *People v. Williams*, 230 Ill. App. 3d 761, 776 (1992) (citing *People v. House*, 141 Ill. 2d 323, 376 (1990); *People v. Terrell*, 132 Ill. 2d 178, 198 (1989)).

¶ 60 Here, defendant was one month shy of being 19 years old at the time he was taken into custody. As such, his reliance on section 103-2.1(a-5) of the Code of Criminal Procedures of 1963 (725 ILCS 5/103-2.1(a-5) (West 2022)), which addresses statements by minors, has no merit. See *id*. (limiting the statutory requirements to subjects "under 18 years of age"). He was a high school graduate with a history of employment. He had one juvenile conviction. The length of defendant's detention was less than 3 ½ hours, and the interrogation was less than an hour. Further, the entire detention was recorded, and the video revealed no sign of abuse or threat. Defendant was provided water and offered restroom breaks during the detention. Finally, any contention that defendant failed to understand his *Miranda* rights was controverted by defendant's invocation of the right to

remain silent later in the interview. Under these facts, we hold that defendant knowingly and voluntarily waived his *Miranda* rights.

¶ 61　Defendant also contends that the detectives minimized the significance of defendant's *Miranda* rights and failed to determine whether he understood and wished to waive the right. As to the former argument, defendant contends this situation is similar to that in *People v. Alfaro*, 386 Ill. App. 3d 271, 306 (2008). However, in *Alfaro*, the police officers "deliberately engaged in the 'question first, warn later' interrogation strategy." *Id.* at 304, 305. More specifically, defendant provided two unwarned, inculpatory statements prior to being read his *Miranda* rights three hours into the interview. *Id.* at 305-06. Further, when defendant was finally read his rights, the officer stated that they were "just a formality." *Id.* at 306.

¶ 62　While defendant claims that the officer introduced his constitutional rights as something they had to do to "tell [him] what's going on," our review of the video finds the claim wholly without merit and misrepresents the video. Further, defendant's argument fails to acknowledge the fact that defendant repeatedly looked up to the officer while the *Miranda* rights were being read and decisively nodded his head after the officer completed the reading and said "okay." We find none of the violations in *Alfaro* apparent here and that *Alfaro* is easily distinguishable. Given defendant's acknowledgment of the rights and the factors addressed above, we cannot find that a meritorious motion to suppress defendant's statements after the *Miranda* rights were provided was viable. As such, we cannot find that defense counsel was ineffective for failing to file a motion to suppress defendant's post-*Miranda* statements.

¶ 63　Defendant also argues that his counsel was ineffective for failing to file a motion to suppress the statements made after defendant invoked his right to silence. Failure to "scrupulously honor" a request to remain silent after the right has been invoked renders any subsequent

26

statements inadmissible. *People v. R.C.*, 108 Ill. 2d 349, 354 (1985). " 'The mere fact that [defendant] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries.' " *People v. Turner*, 56 Ill. 2d 201, 206-07 (1973) (quoting *Miranda*, 384 U.S. at 445). To determine whether defendant's request to stop speaking was scrupulously honored, courts "consider whether (1) the police immediately halted the initial interrogation after the defendant involved his right to remain silent; (2) a significant amount of time elapsed between the interrogations;" (3) a new set of *Miranda* warnings was issued prior to the second interrogation; and (4) the second interrogation involved a crime that was not the subject of the first interrogation. *People v. Nielson*, 187 Ill. 2d 271, 287 (1999).

¶ 64    Here, the interrogation was immediately stopped after defendant invoked his rights, and we find defendant's interpretation of the video following invocation of his rights misleading. The police returned, three minutes later, so an officer could take DNA swabs and photographs. We do not dispute that no new *Miranda* warnings were issued when the officer returned. However, the second interrogation stemmed from defendant asking the detectives numerous questions and becoming extremely upset with the responses, all of which were the subject of the same crime.

¶ 65    As noted above, a contention of ineffective assistance of counsel for the failure to file a motion to suppress requires the defendant to show the unargued motion was meritorious and a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *Gayden*, 2020 IL 123505, ¶ 28. Here, even if an unargued motion had merit, there is no reasonable probability that the trial outcome would have been different. The State did not present or rely on any portion of defendant's interview after he invoked his right to silence. A defendant's failure to establish both deficient performance by counsel and prejudice stemming

from counsel's deficient performance precludes any finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11 (citing *People v. Patterson*, 217 Ill. 2d 407, 438 (2005)). As the evidence that defendant claims should be suppressed was never presented to the trial court, no prejudice can be found because no different outcome is possible. As such, defendant's claim of ineffective assistance of counsel for failing to move to suppress the statements defendant made after he invoked his right to remain silent has no merit.

¶ 66          C. Ineffective assistance of counsel during cross-examination

¶ 67    Defendant next argues that his trial counsel provided ineffective assistance because during Asia's cross examination counsel introduced Asia's statement to police that said, "[I]f there's a guy in here, I'm going to kill him." He further asked Officer McCartney to confirm whether Asia spoke to defendant when he was leaving Asia's apartment. Officer McCartney confirmed the exchange and stated that Asia told him that her words to defendant were "You are weird. Why would you come here and do that." Generally, which witness to call for testimony and the manner and extent of cross examination are matters of trial strategy that will not support ineffective assistance of counsel claims. *People v. Leeper*, 317 Ill. App. 3d 475, 482 (2000) (citing *People v. Reid*, 179 Ill. 2d 297, 310 (1997)). There is a presumption that defense counsel will pursue "sound trial strategies." *Strickland*, 466 U.S. at 689. A showing that trial counsel's strategy was unsound requires more than a lack of success at trial; the strategy must be "irrational and unreasonable in light of the circumstances that defense counsel confronted at the time" of trial. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997). Rebuttal of the presumption that trial counsel's trial strategy was sound is shown when the chosen strategy is "so unsound that counsel completely fails to conduct any meaningful adversarial testing" (*People v. Leeper*, 317 Ill. App. 3d 475, 482 (2000)) or "when

28

no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies." *Faulkner*, 292 Ill. App. 3d at 394.

¶ 68    Here, while defendant calls the statements "damning," claiming they provided elements of "intent to cause harm" and further showed that defendant shot Adrian, he fails to address why defense counsel may have asked Asia and Officer McCartney about the statements. Here, review of the cross examination reveals that defense counsel was trying to impeach Asia with the statements by showing that she fabricated the statement because it was not heard on the Ring doorbell video. The entire defense strategy was based on the credibility of Asia and Lupe, which was addressed in both the opening and closing statements, as well as both motions for a directed verdict. Generally, impeachment of a witness is a matter of trial strategy and immune from claims of ineffective assistance (*People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58) unless " 'counsel entirely fails to conduct meaningful adversarial testing.' " *People v. West*, 187 Ill. 2d 418, 432-33 (1999) (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)). While defense counsel was ultimately unsuccessful in persuading the court of Asia and Lupe's lack of credibility, the attempt to discredit Asia was reasonable strategy and undermines defendant's claim that counsel failed to conduct meaningful adversarial testing. Further evidence revealed that the reason the statement was not on the video was because the Ring doorbell was activated by motion, not sound. When defendant left Asia's apartment, she was already in the parking lot. Once defendant passed the Ring doorbell, no activity occurred that would have triggered the conversation in the parking lot.

¶ 69    Once again, in order for defendant to succeed with his ineffective assistance of counsel claim, defendant must show deficient performance by his trial counsel and prejudice stemming from the deficient performance. *Henderson*, 2013 IL 114040, ¶ 11. Here, we further find that even if defense counsel's trial strategy was deficient, prejudice cannot be shown. The trial court found

29

intent to kill by the fact that defendant shot at Adrian eight times, despite Adrian being unarmed and sleeping when defendant walked into the room. Further, the trial court relied on Asia's testimony regarding her identification of defendant holding a weapon when he pushed into her apartment as the basis of finding defendant was the shooter. The trial court's very detailed ruling on defendant's guilt was not premised on either of the statements which are the basis of defendant's issue. Accordingly, we find that in addition to failing to show trial counsel's cross examinations of Asia and Officer McCartney did not amount to adversarial testing, defendant fails to show prejudice. Accordingly, we hold that defendant failed to show his trial counsel was ineffective during his cross examinations of Asia and Officer McCartney.

¶ 70                                              D. Sentencing

¶ 71     Defendant argues that his sentence was excessive and unconstitutional. In support of excessiveness, defendant argues that the court failed to properly consider his rehabilitative potential despite his young age. As to the latter argument, defendant contends that the trial court relied on improper factors in determining defendant's sentence. Neither argument was sufficiently preserved at the trial court level and therefore, defendant requests review under the first prong of plain error.

¶ 72     "[I]t is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 543 (2010). "Failure to do so forfeits any review of the error." *People v. Jackson*, 2022 IL 127256, ¶ 15. The plain error doctrine is a limited exception to the forfeiture rule. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). First prong plain error requires the defendant to show that a clear or obvious error occurred, and the evidence was so closely balanced that the error threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *People*

*v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step is to determine whether error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 73    "[A] reviewing court will not substitute its judgment for that of the trial court merely because it would have balanced the appropriate sentencing factors differently." *People v. O'Neal*, 125 Ill. 2d 291, 298 (1988). Great deference is afforded the trial court's judgment of sentence because the trial court " 'having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the "cold" record.' " *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010) (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). "[T]he imposition of sentence is a matter of judicial discretion and the standard of review to determine whether a sentence is excessive is whether the trial court abused that discretion." *O'Neal*, 125 Ill. 2d at 297-98. "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000) citing *Fern*, 189 Ill. 2d at 54). Accordingly, our consideration of error is applied with these principles in mind.

¶ 74    The basis of defendant's claim of an excessive sentence is his claim that his 50-year sentence does not reflect adequate consideration of his rehabilitative potential, given his youth. He then argues, citing *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012), that his youth is an excellent basis for establishing his rehabilitative potential and the court failed to consider his youth.

¶ 75    Unfortunately for defendant's claim, the trial court specifically stated it was considering the "character of the Defendant with the objective of restoring him to useful citizenship." The language indubitably addresses defendant's rehabilitation potential. The court further considered defendant's age mistakenly believing that defendant had just turned 18, at the time the crime

31

occurred, when defendant was actually one month shy of turning 19 when the murder occurred. Notably, *Miller* does not apply once a defendant is 18 years of age. *People v. Spencer*, 2025 IL 130015, ¶ 32.

¶ 76    Even more problematic for defendant is the fact that the trial court considered factors under section 5-4.5-105 of the Code of Corrections (730 ILCS 5-4.5-105 (West 2022)) even though it was well aware that defendant had already reached the age of majority. Despite defendant's majority status, the court believed the section 5-1.5-105 factors were "important" to consider. The court noted that the factors should be considered mitigation but found that when the factors were considered as to defendant, the factors were not mitigating. More specifically, the court found that defendant acted alone and was not in a gang. It further noted that defendant's act was not impetuous, was planned, and that defendant had a good relationship with his family. The court also specifically noted that section 5-4.5-115 of the Code of Corrections (*id.* § 5-4.5-115(b))— which was applicable only for defendants under the age of 21 at the time of the offense—provided defendant with an opportunity to be eligible for potential parole after serving 20 years or more of his sentence. Under these facts, we can find no error because the court did consider both rehabilitative potential and age when it sentenced defendant.

¶ 77    Defendant also argues that the court considered improper factors during sentencing. He contends that the trial court considered his "mental health, substance abuse, and the characteristics of youth" as "aggravating, rather than mitigating." Defendant again requests first prong plain error for our review of this issue because it was not properly preserved either. We review whether the court applied improper factors *de novo*. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18.

¶ 78    Typically, the term "improper factors" during sentencing involves the trial court improperly considering factors inherent in the crime itself as a factor in aggravation at sentencing

32

because this would result in improper double enhancement. See *e.g. People v. Conover*, 84 Ill. 2d 400, 404-05 (1981); see also, *People v. Phelps*, 211 Ill. 2d 1, 14 (2004). A sentence based upon an improper aggravating factor unjustly affects a defendant's "fundamental right to liberty" and violates his right to be sentenced on proper factors. *People v. James*, 255 Ill. App. 3d 516, 531 (1993).

¶ 79 Here, defendant's issue contends that the court's consideration of his mental health and substance abuse was for aggravating factors, instead of mitigating factors as required by section 5-4.5-105(a) of Code of Corrections. (730 ILCS 5/5-4.5-105(a) (West 2022)). As noted above, section 5-4.5-105(a) is not applicable to defendant as he was over the age of 18 at the time the offense was committed. *Id.* The factors for aggravation and mitigation that were applicable for defendant are found in sections 5-5-3.1 and 5-5-3.2 of the Unified Code of Corrections. See *id.* §§ 5-5-3.1, 3.2. Notably, neither age nor substance abuse is listed as a mitigating factor under section 5-5-3.1. *Id.* § 5-5-3.1. While mental health is a mitigating factor (see *id.* § 5-5-3.1(a)(16)) it must be a "serious mental illness" that afflicted the defendant "[a]t the time of the offense." *Id.* Here, there is neither evidence or allegation of a serious mental illness nor evidence or allegation that said illness afflicted defendant at the time he murdered Adrian.

¶ 80 Despite the lack of substantiating evidence related to defendant's statements regarding his mental health when the PSI was prepared, the court still considered the issue. Further, despite the lack of necessity, the court also considered defendant's age. Contrary to claims by defendant, the trial court considered defendant's mental health and age as mitigating factors specifically stating, "There is mitigation here. He's young. He has no record. He has mental health issues."

¶ 81 Regarding substance abuse, the trial court did find that that defendant's use of drugs and alcohol were mitigating factors. The court specifically stated, "There's the aggravation that he was

33

angry. He's used drugs and alcohol. He's enjoyed being around the gun culture." As noted above, the court was not required to consider substance abuse as a mitigating factor. We further note that consideration of substance abuse as an aggravating factor is well-established. See *People v. Montgomery*, 192 Ill. 2d 642, 674 (2000) (alcohol and drug abuse testimony is not necessarily mitigating and the court is "not required to share the defendant's assessment of the information"); *People v. Munson*, 171 Ill. 2d 158, 193-94 (1996) (a trial court is not constrained to find evidence proffered as mitigating to be, in fact, mitigating); *People v. Whealon*, 185 Ill. App. 3d 570, 574 (1989) (drug addiction can be considered as either a mitigating or aggravating factor); *People v. Scott*, 225 Ill. App. 3d 938, 941 (1992) (same). The burden of persuasion for plain error rests with the defendant. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Here, we cannot find that the trial court's decision not to view defendant's substance abuse as a mitigating factor was error. As no clear and obvious error can be found regarding the court's sentence based on its consideration of defendant's age, mental health and history of substance abuse, we will honor the procedural default. See *Hillier*, 237 Ill. 2d at 545 ("If the defendant fails to meet his burden, the procedural default will be honored.").

¶ 82    In the alternative, defendant contends that his trial counsel rendered ineffective assistance for failing to include the above-stated arguments in a post-sentencing motion. While forfeited errors may suffice as a basis for ineffective assistance of counsel claims (see *People v. Lear*, 175 Ill. 2d 262, 278 (1997)), such application here is unwarranted. As with the previous claims of ineffective assistance of counsel, we follow the *Strickland* standard which requires defendant to show that counsel's performance was deficient, and defendant was prejudiced as a result of the deficiencies. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). Here, regardless of counsel's alleged deficiencies, no prejudice can be shown where asserting the issues would be futile. As noted above,

34

no error was shown by the trial court's consideration and classification of the evidence at sentencing. "[T]he failure of a defendant to show that error occurred at all defeats both an ineffective assistance claim and a claim of error under either prong of the plain error doctrine." *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 (citing *People v. Rutledge*, 409 Ill. App. 3d 22, 25 (2011)). Because no error was found, defendant's claim of ineffective assistance of counsel for failure to preserve the issue must also fail.

¶ 83        E. Counsel's failure to raise a proportionate penalties clause claim

¶ 84    Defendant's final argument contends that his trial counsel was ineffective for failing to raise a proportionate penalty claim related to the 25-year mandatory enhancement to defendant's sentence based on the trial court's finding that defendant "personally discharged a firearm that proximately caused *** death to another person." See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2022).

¶ 85    A sentence violates the proportionate penalties clause where either the penalty is harsher than the penalty for a different offense containing identical elements or "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *People v. Hilliard*, 2023 IL 128186, ¶ 20. A sentence of any length may be challenged under the proportionate penalties clause. *Id.* ¶ 29.

¶ 86    Defendant claims here that his attorney argued that the mandatory enhancements should not be imposed but failed to support the argument. Our review of the record reveals that, at most, defense counsel argued prior to sentencing that, "Your Honor, by contrast with the State I think the minimum sentence which this Court's gonna respect is way too much." After the court rendered its sentence, it allowed defense counsel to file, and orally argue, a motion to reduce sentence. The written motion stated, "Reduce [defendant's] sentence to the 45-year IDOC without parole minimum" and "The minimum sentence is nonetheless extreme and inappropriate." After the court

35

reviewed the motion, it asked defense counsel if there was anything else he wished to say. Defense counsel responded, "Just this, your Honor, had the sentence been much greater than 50 I would have made a more concentrated effort on this, but it's so close that I fear it's just simply appropriate for me to file it and say nothing else." Accordingly, we find nothing in the record to support defendant's conclusion that counsel provided a specific argument that the minimum sentence in this case was inappropriate, which would certainly explain why trial counsel "gave the court no legal reasoning as to why that was the case" as claimed in defendant's brief.

¶ 87    Defendant claims, citing *People v. Estrada*, 2024 IL App (1st) 230029-U, ¶¶ 50-54 and *People v. Spann*, 332 Ill. App. 3d 425, 436-37 (2002), that counsel's failure to present evidence on the argument was deficient. He further claims that he was prejudiced by trial counsel's failure because the State and the court agreed that a 25-year sentence would have been appropriate at the sentencing conference held before trial.

¶ 88    Defendant's argument is presumed to be an "as applied" challenge since the statutory 25-year firearm enhancement (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2022)) has been found to be constitutional under claims of cruelty, degradation, or shocking the moral sense of the community. *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). Defendant's argument places strong reliance for his claim on *People v. Miller*, 202 Ill. 2d 328, 330 (2002). While defendant and Leon Miller were both sentenced to 50 years' imprisonment for their convictions (see *id.* at 332), we find that *Miller* is distinguishable both on the ages of the defendants and their participation in the crimes.

¶ 89    Notably, Leon Miller was 15-years old, had "one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun." *Id.* at 341. Here, defendant, who was 18 years old, and would turn 19 the following month, brought

36

the gun to Asia's apartment, pushed himself into the apartment, and used the gun repeatedly on an unarmed, sleeping man. Further, the shots were fired while other people were in the apartment.

¶ 90    We find the facts in defendant's case are more similar to *People v. Hilliard*, 2021 IL App (1st) 200112, than *Miller*. While the defendant in *Hilliard* received a 40-year sentence of incarceration (see *id.* ¶ 1), compared with defendant's 50-year sentence, Hilliard's conviction was for attempted murder following a shooting, not first degree murder. Both Hilliard and defendant were 18 years old at the time the crimes were committed, and both of their sentences were increased by the 25-year firearm enhancement. *Id.* ¶¶ 1, 12. Notably, in the first *Hilliard* appeal, the appellate court found the claim "was 'best suited' for the trial court where the factual record could be developed as necessary." See *Id.* ¶ 13; see also *People v. Hilliard*, 2017 IL App (1st) 142951-U, ¶ 42.

¶ 91    In order to make a claim that defendant's sentence was improper under the proportionate penalties clause, counsel was required to show that, as applied to the defendant, the sentence was cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *Miller*, 202 Ill. 2d at 338; *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). By relying on an immature brain defense, as seen here, defendant would have been required to "demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25 (quoting *Klepper*, 234 Ill. 2d at 348)).

¶ 92    Here, while evidence of defendant's alleged mental health and substance abuse issues are found in the PSI, the statements are insufficient to support the claim being made on appeal and we

are being asked to address evidence submitted on appeal through citations to journal articles and the PSI although the journal article was never addressed by the trial court. "[A] reviewing court will not take judicial notice of critical evidentiary material not presented in the court below, especially where the evidence may be significant in the proper determination of issues between the parties." *Kennedy v. Edgar*, 199 Ill. App. 3d 138, 143 (1990).

¶ 93    While defendant also relies heavily on *Estrada*, 2024 IL App (1st) 230029-U, in support of his ineffective assistance claim, *Estrada* is also distinguishable from the case at bar. Notably, trial counsel in *Estrada* presented a written proportionate penalties claim, evidence in support thereof, as well as evidence and argument at the resentencing hearing. *Id.* ¶¶ 22-24, 27-28, 30-33. In response, the *Estrada* trial court specifically stated that it could not sentence defendant below the minimum statutory sentence and found that trial counsel failed to present sufficient evidence in support of the claim. *Id.* ¶ 55. The appellate majority interpreted the trial court's statement as a reasonable probability that "the court would have imposed a lesser sentence" if trial counsel had submitted additional evidence in support of the defendant's proportionate penalties claim. *Id.* ¶ 56.

¶ 94    Here, the trial court specifically found that defendant's actions required a sentence greater than the 45-year minimum required by statute. It stated, "I don't think the minimum under the circumstances are appropriate" due to the nature and circumstances of the case. Further, unlike the trial counsel in *Estrada*, no claim under the proportionate penalties clause was raised, no evidence in support of the claim was submitted, and defense counsel requested the court issue defendant the minimum statutory sentence, not something lower. As such we find *Estrada* distinguishable and the factual basis for his ineffective assistance of counsel claim lacking.

¶ 95    It is well-established that "as-applied constitutional claims cannot ultimately succeed absent a sufficiently developed evidentiary record." *People v. Spencer*, 2025 IL 130015, ¶ 45

38

(citing *People v. Harris*, 2018 IL 121932, ¶ 48; *People v. Thompson*, 2015 IL 118151, ¶ 44). Given the lack of any previously filed proportionate penalty claim, the lack of evidence presented in support of the claim, and the precedential authority of *Spencer*, we find that the issue of whether defendant's trial counsel was ineffective is premature. We therefore hold that the issue would be more appropriately presented in a postconviction proceeding under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)).

¶ 96                                    III. CONCLUSION

¶ 97    For the above-stated reasons, we affirm defendant's conviction and sentence.


¶ 98    Affirmed.